IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| APARTMENT INSIDERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:25-cv-01137 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| MIRAKLE HENSEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

___

| | | |
|---|---|---|
| MIRAKLE HENSEN, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | NO. 3:25-cv-01137 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| APARTMENT INSIDERS, LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| | ) | |

## ORDER

Pending before the Court is a "Motion for Temporary Restraining Order" (Doc. No. 14, "Motion"), filed by Plaintiff, Apartment Insiders, LLC, wherein Plaintiff "moves the Court to temporarily restrain Defendant, Mirakle Hensen, from violating restrictive covenants and other contractual obligations contained in Sections 4, 5, 6, and 9 of the Business Protection Agreement." (*Id.* at 1).[1] Accompanying the Motion is a "Proposed Temporary Restraining Order" (Doc. No. 14-

---

[1] Mirakle Hensen has brought counterclaims, (Doc. No. 11), such that she is a Counter-Plaintiff, and Apartment Insiders, LLC is a Counter-Defendant (as reflected in the caption above). But for ease of reference, the Court herein refers to Apartment Insiders, LLC simply as "Plaintiff" and to Mirakle Hensen simply as "Defendant."

1). The Motion is also supported by a memorandum (Doc. No. 15, "Opening Brief"). In connection with the Motion and Opening Brief, Plaintiff also filed a "Declaration of Joel Sanders" (Doc. No. 15-1), containing the declaration of Joel Sanders, i.e., a declaration of the "Founder and CEO of Plaintiff." (*Id.* at 1).

Via the Motion, Plaintiff requests that this Court enter an order temporarily restraining Defendant from (1) "using or disclosing any information that she generated or obtained at any time during her relationship with Plaintiff that is a trade secret, information not generally known to or readily ascertainable by real estate agents outside of Plaintiff, information that she or Plaintiff are contractually or ethically obligated to protect from unauthorized use or disclosure, or any kind of physical or electronic information;" (2) "assisting, offering to assist, or helping anyone else assist or offer to assist any tenant find or secure residential rental housing whom she met or interacted with during her affiliation with Plaintiff;" and (3) "discouraging or helping anyone else discourage any landlord, property owner, property investor, or property debt relationship, whom she met or interacted with during her affiliation with Plaintiff, from doing business with Plaintiff." (Doc. No. 14-1 at 2).

For the reasons described below, the Court **DENIES** the Motion.

FACTUAL BACKGROUND[2]

Plaintiff filed a complaint in this Court on October 2, 2025 (Doc. No. 1, "Complaint"). Via the Complaint, Plaintiff brings a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et*

---

[2] The following facts, unless somehow qualified herein (as for example by "Plaintiffs allege that" or "Defendants assert that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

*seq.* ("DTSA") for "trade secret misappropriation" and a claim for "breach of contract under Tennessee law." (*Id.* at 5-6).

Plaintiff is "a Nashville-based apartment locating company that also operates in the Charlotte, North Carolina and Tampa, Florida areas." (Doc. No. 15 at 1). Plaintiff's "business is centered around (i) forming relationships with residential tenants and landlords, (ii) learning and compiling non-public information regarding tenant preferences, landlord unit availability, and landlord incentives, and (iii) placing tenants in units that align with their preferences." (*Id.* at 2). Defendant is one of Plaintiff's "former real estate agents in Charlotte[, North Carolina]." (*Id.* at 1). During Defendant's relationship with Plaintiff, Defendant "signed the Business Protection Agreement." (*Id.* at 1).[3] The Business Protection Agreement contains four provisions relevant for present purposes:

> 4. Confidentiality. During and following the term of this Agreement, except on behalf of the Company, I will not use or disclose any information that I have generated or obtained at any time during my relationship with the Company that is a trade secret, information not generally known to or readily ascertainable by real estate agents outside of the Company, or information that the Company or I are contractually or ethically obligated to protect from unauthorized use or disclosure (collectively, "Company Information").
>
> 5. Client Interference. During the term of this Agreement and for eighteen (18) months thereafter, except on behalf of the Company, I will not assist, offer to assist, or help anyone else assist or offer to assist any client of the Company with finding or securing residential rental housing.
>
> 6. Landlord Interference. During the term of this Agreement and for eighteen (18) months thereafter, I will not discourage or help anyone else discourage any landlord from doing business with the Company. For purposes of this Agreement, landlords include, without limitation, property management companies that the Company does business with or would like to do business with, property owners, property investors, and property debt relationships.

***

---

[3] The Business Protection Agreement is located at Docket No. 1-1.

> 9. Return of Property. Within three (3) business days of the termination of my relationship with the Company or the Company's request at any time, I will return all Company property in my possession, including, without limitation, all equipment, tools, devices, keys and other means of accessing Company facilities and property, login information for Company accounts, Company Information, any other physical or electronic information that I have obtained or generated in connection with my relationship with the Company, and anything belonging to the Company's clients.

(Doc. 1-1 at §§ 4-6, 9).

Ultimately, Plaintiff terminated its business relationship with Defendant on July 30, 2025. (Doc. No. 15 at 7). Defendant then "immediately joined a direct competitor [of Plaintiff]—Carolina Apartment Locating—where [Plaintiff] believes [Defendant] is actively using [Plaintiff's] confidential business information and pursuing and working with its tenants and landlords in violation of the Business Protection Agreement."[4] (*Id.*). Plaintiff further states that it "believes" that Defendant "is using [Plaintiff's] confidential business information to directly compete on behalf of Carolina Apartment Locating." (*Id.*). In support of this belief, Plaintiff notes that while "affiliated with [Plaintiff], [Defendant] was able to access business-related information online via a password-protected cloud drive" and that "[d]uring the week preceding [Defendant's] termination, [Defendant] downloaded at least two compilations that identify [Plaintiff's] landlords in the Charlotte area and the referral fees they pay [Plaintiff] for successfully placing tenants." (*Id.*). Plaintiff also notes that Defendant "sent her last three months of production reports to her personal email address," and that these "reports list the tenants that [Defendant] placed at [Plaintiff], where [Defendant] placed them, and the state and end dates of their leases." (*Id.*). Summing up, Plaintiff argues that "[c]ompetition was the most logical reason for [Defendant] to take all of this information." (*Id.*).

---

[4] According to an exhibit to Defendant's motion to dismiss (which was filed on October 24, 2025), Carolina Apartment Locating discontinued its relationship with Plaintiff on September 17, 2025. (Doc. No. 12-1 at 34).

Plaintiff also "believes that [Defendant] is exploiting [Defendant's] tenant and landlord relationships to directly compete on behalf of Carolina Apartment Locating." (*Id.*). In support of this contention, Plaintiff notes that none of the tenants in Defendant's pipeline of meetings at the time of Defendant's termination have since contacted Plaintiff for assistance in finding an apartment. (*Id.* at 8).

Finally, Defendant "also setup a TikTok account that she regularly uses to market units currently available from [Plaintiff's] landlords," and "[t]o conceal her activities, [Defendant] has blocked key [members of Plaintiff's] personnel from viewing her TikTok account." (*Id.* at 8).

According to Plaintiff, Defendant's conduct, summarized above, constitutes "violations of Sections 4, 5, 6 [and] 9 of the Business Protection Agreement," and the Court should grant a TRO to prevent further violations by Defendant of those provisions. (*Id.* at 11).

## PROCEDURAL BACKGROUND

Before analyzing the merits of Plaintiff's Motion, the Court provides a brief overview of the procedural background of this case and a related state court proceeding (hereinafter, "Circuit Court Case"). As Plaintiff acknowledges, "[o]n August 22, 2025," Plaintiff "filed a . . . breach of contract claim against [Defendant] in the" Circuit Court for Davidson County, Tennessee (hereinafter, "Circuit Court") (*Id.* at 8). [5] On September 15, 2025, the Circuit Court entered a "temporary restraining order" against Defendant (hereinafter "Circuit Court TRO"), enjoining

---

[5] Via a pending motion to dismiss (Doc. No. 12), Defendant attached portions of the record of the Circuit Court Case, including the Circuit Court's order denying Plaintiff's motion for a temporary injunction. (Doc. No. 12-1 at 1-17). The Court relies on these portions of the Circuit Court Case in the record below where necessary.

Defendant temporarily from further violations of the Business Protection Agreement.[6] (*Id.* at 8). Plaintiff then made a motion (Doc. No. 12-1 at 1-10, "Circuit Court Motion") "to convert the [Circuit Court TRO] . . . into a temporary injunction" on largely the same grounds that Plaintiff brings its current Motion. (*Id.* at 1). After a hearing, the Circuit Court denied Plaintiff's Circuit Court Motion, finding that "the client restrictions in Defendant's non-compete [meaning the Business Protection Agreement] are not enforceable as written" because non-competes "can . . . be enforced [only] with respect to current clients" and that there was "insufficient evidence in the record for the Court to determine the identities of Plaintiff's current clients, and Defendant has testified that she does not know them." (Doc. No. 12-1 at 15).

After the Circuit Court denied the Circuit Court Motion, Plaintiff "decided to voluntarily dismiss the [Circuit Court Case], without prejudice, so that [it] could refile in federal court and add a claim under the [DTSA]." (Doc. No. 15 at 9, Doc. No. 12-1 at 16). The Circuit Court Case was dismissed on October 2, 2025, (Doc. No. 15 at 9), and Plaintiff subsequently filed the instant federal action, asserting a claim under the DTSA and a claim for breach of contract under Tennessee law. (Doc. No. 1 at 5-6).

## LEGAL STANDARD

Those seeking a TRO must meet four requirements.[7] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance of equities

---

[6] Although Plaintiff does not say this explicitly, based on the context of the Motion, the Court understands the Circuit Court TRO to have been issued based on grounds similar to those asserted by Plaintiff in connection with the present Motion.

[7] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*)

favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

It is often stated that a district court has discretion to grant or deny TROs. *See, e.g., Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). If that is the case, then it follows that the district court must have the discretion to grant or deny a TRO even if the movant has

---

that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter*.").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Southern Poverty Law Ctr. V. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV–1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

shown (by satisfaction of the four requirements) that it is at least *eligible* for a TRO.[8] *See Doe v. Rausch*, No. 3:24-CV-01403, 2025 WL 57711, at *4 (M.D. Tenn. Jan. 9, 2025).

The Court's conclusion that it has the discretion to deny a TRO even if the movant has shown it is eligible for a TRO is buttressed by caselaw from federal circuit courts (although not as yet the Sixth Circuit), as well as numerous other district courts. *See e.g., RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, No. 23-10453, 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024) ("Even in those cases where the requirements of a permanent injunction have been met, a court maintains broad discretion to deny permanent injunctive relief."); *Bethesda Softworks, L.L.C. v. Interplay Ent. Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) ("'whether to grant the injunction still remains in the 'equitable discretion' of the [district] court' even when a plaintiff has made the requisite showing." (quoting *Christopher Phelps & Assocs., LLC v. Galloway,* 492 F.3d 532, 543 (4th Cir. 2007))); *Franciscan All, Inc. v. Burwell*, 227 F. Supp.3d 660, 677 (N.D. Tex. 2016) (finding that even when the movant satisfies the four preliminary injunction factors, "the decision whether to grant or deny a preliminary injunction remains discretionary with the district court."). *See also Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

ANALYSIS

Assuming *arguendo* that Plaintiff has met the four requirements discussed above such as to be eligible for a TRO, *Winter*, 555 U.S. at 20, the Court in its discretion nevertheless denies Plaintiff's requested TRO. *See e.g., RJ's Int'l Trading*, 2024 WL 1509156, at *2.

---

[8] This is because the district court obviously has no discretion to grant a TRO when the requirements for a TRO are *not* all satisfied; otherwise, those requirements would not actually be requirements at all. So the only context in which a district court could possibly have discretion when it comes to issuing or declining to issue a TRO is the context where the movant has satisfied all the requirements for a TRO.

The limited record of the Circuit Court Case before the Court suggests that Plaintiff is engaged in the sort of forum shopping that the courts "should uniformly discourage." *United States v. Bailey*, 193 F. Supp. 2d 1044, 1051 (S.D. Ohio 2000). Plaintiff brought this action, and subsequently its Motion, in this Court only after the Circuit Court denied Plaintiff's Circuit Court Motion (which itself was brought on largely the same grounds that Plaintiff brings its current Motion) to convert the Circuit Court TRO "into a temporary injunction." (Doc. No. 12-1 at 1-11, 13-15). In other words, Plaintiff elected to avail itself of federal jurisdiction and seek a second TRO only after receiving an unfavorable decision in the Circuit Court. If the Court were to grant Plaintiff's Motion under these circumstances, it would be failing in its responsibility to "protect both the state and federal court systems from the illegitimate gamesmanship involved in forum shopping." *In re Best Reception Systems, Inc.*, 220 B.R. 932, 955 (B.R. Tenn. 1998).

To the extent that Plaintiff suggests that it dismissed the Circuit Court Case merely so that it "could refile in federal court and add a claim under the [DTSA]," (Doc. No. 15 at 9), this argument is unavailing for two reasons.

First, there is nothing that would have prevented Plaintiff from bringing its DTSA claim in state court. In our federal system, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Accordingly, "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Id.* Thus, "if exclusive [federal] jurisdiction be neither express nor implied, the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it." *Id.* at 459 (quoting *Claflin v. Houseman*, 93 U.S. 130, 136 (1876)). The presumption of state-court competence to hear federal claims may be rebutted only if Congress indicates its intent for

exclusive federal jurisdiction via "an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Id.* at 459–60 (quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 (1981)).

Here, there is nothing in the DTSA that provides for exclusive federal jurisdiction. The jurisdictional provision of the DTSA provides merely that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under this section." 18 U.S.C. § 1836(c). As the Second Circuit recently noted when interpreting the DTSA, "[s]tatutes with materially analogous jurisdictional grants have been interpreted to confer concurrent jurisdiction on the state courts." *Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, 110 F.4th 106, 116 (2d Cir. 2024). Moreover, as the Second Circuit also recently found, the legislative history of the DTSA "reveals no evidence that Congress . . . affirmatively intended to confer exclusive jurisdiction over [DTSA] claims on the federal courts," because, in enacting the DTSA, Congress actually struck statutory language that would have conferred exclusive jurisdiction on the federal courts. *Id*. And, again as the Second Circuit recently found, there is "no incompatibility between state-court jurisdiction over DTSA claims and the federal interests embodied in that statute." *Id.* at 117.

Thus, the Court concludes that the state courts are not forbidden from hearing DTSA claims such as Plaintiff's. This is a conclusion supported by myriad cases from around the country. *See e.g., Beijing Neu Cloud*, 110 F.4th at 117 ("state courts have concurrent jurisdiction over DTSA claims"); *AA Med. P.C. v. Almansoori*, No. 20-CV-3852, 2023 WL 7688688, at *16 (E.D.N.Y. Oct. 4, 2023) ("DTSA . . . claims can be brought in state or federal court"); *Preferred Freezer Servs., LLC v. Americold Realty Tr.*, No. 19-CV-2926, 2020 WL 774132, at *4 (S.D.N.Y. Feb. 18,

2020) (finding that Congress "granted state courts concurrent jurisdiction over [DTSA] claims"); *XPO GF Am., Inc. v. Qiuheng Liao*, No. 19-4173, 2019 WL 8226077, at *4 (C.D. Cal. Sept. 27, 2019) (finding that "state and federal courts have concurrent jurisdiction" over DTSA claims); *Allstate Ins. Co. v. Jewell*, No. 17-CV-140, 2019 WL 3526703, at *4 (W.D. Ky. May 21, 2019) (finding "no indication that Congress affirmatively divested state courts of jurisdiction to hear claims under the DTSA."); *1-800 Remodel, Inc. v. Bodor*, No. 18-CV-472, 2019 WL 856399, at *2 n.3 (C.D. Cal. Jan. 28, 2019) ("there is no indication that federal courts have *exclusive* jurisdiction over DTSA . . . claims."); *G4S Secure Integration LLC v. EX2 Tech., LLC*, No. 17-CV-4277, 2017 WL 11884191, at *5 (N.D. Ill. July 19, 2017) (jurisdiction over DTSA claims is "not exclusive to federal courts."). Moreover, numerous state courts have already heard DTSA claims. *See, e.g.*, *BIOMILQ, Inc. v. Guiliano*, No. 22-255, 2024 WL 1698061, at *20–21 (N.C. Super. Ct. Apr. 19, 2024); *Power Home Solar, LLC v. Sigora Solar, LLC*, No. 20-7165, 2021 WL 2530984, at *11–15 (N.C. Super. Ct. June 18, 2021).

True, a small number of courts have found it debatable or untenable that state courts have concurrent jurisdiction over DTSA claims. See *Custom Truck One Source, Inc. v. Norris*, No. 22-CV-46, 2022 WL 474006, at *4 (N.D. Ind. Feb. 16, 2022) ("[W]hether concurrent jurisdiction exists over the DTSA claim is a subject of debate."); *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 379 (S.D.N.Y. 2020) ("there is debate concerning whether" DTSA claims can "even be brought in state court"); *Lamont v. Conner*, No. 18-CV-4327, 2019 WL 1369928, at *7 (N.D. Cal. Mar. 26, 2019) (finding that the DTSA "provides exclusive . . . jurisdiction to the District Courts"). But the Court finds them unpersuasive.

Therefore, there was (and is) nothing to prevent Plaintiff from bringing its DTSA claim in state court.

Moreover, to the extent that Plaintiff wished to avail itself of federal jurisdiction (and therefore seek a TRO in this Court) prior to adding its federal DTSA claim, there is nothing in the record that indicates that Plaintiff would have been unable to do so. As Plaintiff alleges in this action, the Court has "diversity jurisdiction over this case because the parties are diverse and [Plaintiff] is seeking more than $75,000 of damages and attorney's fees from [Defendant]." (Doc. No. 1 at ¶ 13). The parties were (presumably) diverse (with Plaintiff being headquartered in Nashville, Tennessee, and Defendant residing in North Carolina) back when Plaintiff first brought suit in Circuit Court on August 22, 2025, and there is no indication that the amount in controversy somehow rose above $75,000 only subsequent to filing in Circuit Court. Thus, as far as the record reveals, if Plaintiff wanted to avail itself of federal jurisdiction prior to receiving an unfavorable ruling from the Circuit Court on the Circuit Court Motion, it could have done so.

Therefore, the Court in its discretion denies Plaintiff's Motion. The record before the Court strongly suggests that Plaintiff, in bringing the present Motion, is engaged in "thinly disguised forum shopping" brought on by its dissatisfaction with unfavorable "rulings in state court." *Mann v. Waste Mgmt. of Ohio, Inc.*, 253 B.R. 211, 215 (N.D. Ohio 2000). This will not do, and to grant Plaintiff's Motion here would be to encourage that kind of forum shopping that the federal courts should "uniformly discourage." *Bailey*, 193 F. Supp. 2d at 1051.[9]

---

[9] The Court generally does not begrudge counsel making choices about where to litigate that are driven by a desire to maximize their client's possibility of success; even if some might call such choices forum-shopping, in some cases it may simply be shrewd lawyering and client-centered advocacy. But what the Court *does* begrudge counsel is hightailing it out counsel's originally chosen forum promptly after being denied requested relief in that forum, and going instead to a different forum to seek the same relief. The latter scenario is patent forum shopping of a kind courts should not countenance.

CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's Motion (Doc. No. 14) is **DENIED**.[10]

All other outstanding motions remain pending before the Court.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[10] None of this is to say that this Court is bent on ensuring or can use its discretion to ensure—due to distaste over forum-shopping—that Plaintiff receive no relief in this Court. Rather, the rationale herein is a rationale only for denying Plaintiff its requested TO.